Marian F. Harrison
US Bankruptcy Judge

Dated: 8/6/2013

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | ) CASE NO. 311-11792 |
| | ) JOINTLY ADMINISTERED |
| CITIZENS CORPORATION, AND | ) CHAPTER 11 |
| FINANCIAL DATA TECHNOLOGY | ) JUDGE MARIAN F. HARRISON |
| CORPORATION, | ) |
| | ) |
| Debtors. | ) |
| | ) |

## MEMORANDUM OPINION

This matter is before the Court upon the motion to disallow the claims of David Myers (hereinafter "Mr. Myers"). The issue in this case is whether Mr. Myers' loss of two CDs pledged as collateral on a loan to Infinite Capital Strategies, Inc., f/k/a Williamson Holdings, Inc. (hereinafter "ICS"), a parent company of Citizens Corporation (hereinafter "Citizens"), which in turn is the parent company of Financial Data Technology Corporation (hereinafter "Fi-Data"), is allowable even though Citizens and Fi-Data were not signatories on the loan. That is, can Citizens and Fi-Data be called to answer for ICS's debts?

For the following reasons, which represent the Court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr. P. 7052, and made applicable by Fed. R.

Bankr. P. 9014(c), the Court finds that the answer is no, and therefore, the Chapter 11 Trustee's motion should be granted and Mr. Myers' claims should be disallowed.

## I. FINDINGS OF FACT

The relevant facts in this case are essentially undisputed. While the testimony and exhibits admitted into evidence were voluminous, the Court believes that the essential facts in reaching this decision are relatively simple in comparison.

Citizens was founded by Marion "Ed" Lowery (hereinafter "Mr. Lowery") in July 1985 as a holding company for banks it purchased. In the fall of 1993, Citizens sold all of its bank holdings and signed a long-term agreement with the First City Bank of Murfreesboro to furnish data processing services. Fi-Data was formed that same year as a wholly-owned subsidiary of Citizens to provide those services. Fi-Data offered its banking customers the FiServ Premier suite of products which included core account processing, item processing, internet banking, and other products. Fi-Data also served as an internet service provider for its clients. In 1993, Citizens owned 100% of Fi-Data's shares. In fact, Fi-Data is the only operating asset that Citizens owned. Citizens' only other business appears to have been making loans that were participated out to other banks.

In 2003, Mr. Lowery also formed Southern Hospitality, Inc., a Tennessee corporation formerly known as Equipment Services Corp. (hereinafter "ESC"). ESC's purpose was to

purchase most of Fi-Data's computer hardware, software, and related property, and the licenses to use this property.

Apart from the sale-and-leaseback transactions with Fi-Data, ESC had no operations or source of income. Its only other sources of funds were borrowings or other infusions of cash from affiliates or outside banks. After the formation of ESC, a number of such sale-and-leaseback transactions between Fi-Data and ESC were consummated. To document these transactions, among other things, ESC and Fi-Data entered into leases pursuant to which ESC authorized Fi-Data to use the rights granted to ESC under the agreements with FiServ, along with the computer equipment. Fi-Data made lease payments to ESC pursuant to these various leases. As Fi-Data needed additional computer hardware, software, and related property, it would from time-to-time purchase or license these from various vendors, primarily FiServ. Then at intervals – usually annually – Fi-Data would sell or assign its rights in the newly-acquired property to ESC, and ESC would lease these back to Fi-Data. This practice continued into 2011.

In 2009, Mr. Lowery formed ICS, which is a holding company without employees. Mr. Lowery is the president, CEO, and majority shareholder of ICS. Mr. Lowery transferred

3 - U.S. Bankruptcy Court, M.D. Tenn.

to ICS his ownership interest in ESC and Citizens in exchange for a controlling interest in ICS, thus making ICS the parent of both Citizens[1] and ESC.

Mr. Myers, a long-time investment broker, became personally acquainted with Mr. Lowery in the 1990s. In 2002, for the first time, he invested in a Lowery-related company, specifically Commerce Bancshares, Inc. (hereinafter "CBI"). The principal holding of CBI was the Peoples State Bank of Commerce. This investment lasted for less than a year, as CBI or Mr. Lowery repurchased this stock at the amount initially paid, $500,000 in cash. During the period of Mr. Myers' ownership, he received two quarterly dividends totaling $6,550.56.

Since 2002, Mr. Myers has made a number of other purchases of stock in CBI and its affiliate Farmers Bancorp, Inc. (hereinafter "Farmers"). Each of these purchases was solicited by Mr. Lowery, who offered to have Citizens finance 100% of the cost, and who assured Mr. Myers that the future dividends and distributions on the stock would be sufficient to pay the interest coming due on Mr. Myers' debt to Citizens.

In 2005, at the urging of Mr. Lowery, Mr. Myers invested $500,000 in Union Federal, LLC, which had been formed to purchase a Hendersonville, Tennessee, savings and loan

---

[1]As stated earlier, Citizens is the parent company of Fi-Data, owning 100% of its stock shares.

company. Later, Mr. Myers agreed to accept 9,900 shares of Class B common stock in Citizens in exchange for his investment in Union Federal, LLC. In January 2009, Mr. Myers acquired 3,479 shares of Citizens' Class A common stock. In June 2009, at the initiative of Citizens, these shares were exchanged for 4,974 shares of Citizens' Class B common stock. In November 2009, Mr. Myers agreed to acquire another 4,975 shares of Citizens' Class B stock at a cost of $575,000.

Apart from Mr. Myers' initial investments in CBI stock and Union Federal, LLC, all of Mr. Myers' investments in Citizens and CBI were financed through loans from Citizens. The first of these loans was dated May 31, 2003, in the principal amount of $2,887,500 and was originally due in July 2008. Mr. Myers and Mr. Lowery were co-makers of this note. This loan was participated to Nexity Bank, and Mr. Myers deposited with that bank, a $600,000 certificate of deposit. Later in 2003, at Mr. Myers' request, this $600,000 certificate of deposit was applied to reduce his portion of the outstanding loan balance.

Between the time of the initial transaction in May 2003 and November 30, 2009, Mr. Myers was a maker or co-maker on at least six additional promissory notes payable to Citizens of various amounts. The balance of the original May 2003 promissory note and several of the other promissory notes were ultimately consolidated into a single note executed by Mr. Myers on November 30, 2009, in the principal amount of $5,875,000. Unknown to Mr. Myers at the time, Citizens sold participations in the loan totaling

5 - U.S. Bankruptcy Court, M.D. Tenn.

$5,875,000 to Tennessee Commerce Bank (hereinafter "TCB") and North Alabama Bank. In August 2011, Citizens conveyed to TCB all its remaining rights, title, and interests in and to this note, which remains unpaid.

At the time of Citizens' Chapter 11 filing, Mr. Myers continued to own 19,849 shares of the Class B common stock of Citizens. This amounted to 10.4% of the total of Citizens' outstanding shares at the time. Other minority shareholders of Citizens held 9.5%, and ICS owned the remaining 80.1%. Beginning with Mr. Myers' initial investment in CBI until March 2011, Mr. Lowery told Mr. Myers on various occasions that the value of his stock in CBI, Farmers, and Citizens was worth more than the amount owed on the loans that he had taken from Citizens.

As a result of his investments in Citizens and CBI, Mr. Myers received dividends totaling in excess of $775,000 before February 1, 2008. Except for a 2010 dividend/interest check-swapping transaction,[2] Mr. Myers received no dividend or distribution from Citizens, CBI, or Farmers after February 1, 2008. During the previous years, Mr. Myers made all

---

[2]In December 2010, Mr. Lowery represented to Mr. Myers that Citizens would be unable to make the interest payment on Mr. Myers' note as previously promised. Mr. Myers, along with the other shareholders of Citizens who had executed similar notes, were presented with dividend checks for calendar year 2010, drawn upon Citizens' account at TCB. Mr. Myers' dividend check dated November 1, 2010, totaled $158,792. Although this check was dated November 1, 2010, Mr. Myers did not receive the check until December 30 when it was delivered to him by Mr. Lowery. At the time, Mr. Myers gave Mr. Lowery a check dated December 30, 2010, payable to Citizens in the amount of $170,294.52, which Mr. Lowery represented was the amount of the interest installment that had come due November 1, 2010, on the Note.

6 - U.S. Bankruptcy Court, M.D. Tenn.

interest payments coming due on notes to Citizens he had signed in connection with his acquisition of stock in Citizens or CBI, with the exception of a few instances in which accrued interest on one note was rolled into the principal amount of a new note.

In 2007 and 2008, Citizens obtained loans in the aggregate of $33.25 million from TCB, secured by Citizens' stock in Fi-Data. As a condition for these loans, Citizens was prohibited from borrowing funds on behalf of Fi-Data, or otherwise encumbering Fi-Data's assets, without TCB's permission. Mr. Lowery originally planned for the dividends of CBI and Farmers, as well as the revenues of Fi-Data, to satisfy the debt service obligations on these notes. However, as the financial market continued its downward spiral in 2008, Fi-Data was thrust into the position of having to service all of Citizens' debt, in addition to its own operations.

For many years, Fi-Data maintained general ledger accounts reflecting the intercompany transactions among it, Citizens, ESC, ICS, and other of the Lowery-controlled entities. Over the years, Fi-Data's operations generated substantial cash flow, and significant portions of this cash flow were transferred to Citizens, ESC, and ICS. Starting in late 2009 or early 2010, Mr. Lowery insisted that more and more cash be transferred out of Fi-Data to Citizens and other Lowery-controlled entities. During this period, Fi-Data's obligations to its parent and affiliates, as opposed to its own business activities, increasingly strained Fi-Data's ability to meet its own obligations. Although Fi-Data netted over $1 million in both

2009 and 2010, it began to experience significant cash flow problems. In the calendar year 2010 alone, Fi-Data transferred several million dollars to Citizens, and ended 2010 with an outstanding receivable from Citizens of $2,500,840.94.

Between September 29, 2010, and January 10, 2011, FiServ issued invoices to Fi-Data and ESC with an aggregate payable of $432,250.34. FiServ's invoices typically have 90-day payment terms. The largest invoice was for $332,059.47, dated November 5, 2010. Neither Fi-Data nor ESC paid these invoices upon receipt, nor did either pay the largest invoice within 90 days. Between November 12 and November 15, 2010, Fi-Data transferred to Citizens a total of $363,000, which funds would have been more than enough to pay the largest FiServ invoice.

As of December 31, 2009, the general ledger for the intercompany account between Citizens and Fi-Data reflected a payable from Fi-Data to Citizens in the amount of $832,620.59. By December 31, 2010, the general ledger reflected a receivable owed by Citizens to Fi-Data in the amount of $2,500,840.94. As a part of these transfers, Fi-Data transferred to Citizens a net amount of $1,225,181.29 from October 1, 2010, through December 31, 2010. Again, this amount would have been sufficient to pay the amounts owed to FiServ.

By letter dated February 23, 2011, FiServ threatened to terminate ESC's and Fi-Data's licenses (or sub-licenses) to use FiServ's software, unless Fi-Data or ESC satisfied certain past-due invoices totaling more than $400,000 by March 18, 2011.

In March 2011, Mr. Lowery requested that Tennessee Bank & Trust (hereinafter "TB&T") loan ICS $1,100,000. TB&T would make the loan only if it were fully collateralized, so Mr. Lowery contacted Mr. Myers and asked him to provide collateral for the loan. Mr. Myers agreed to pledge two CDs with total value of $750,000 as collateral for the TB&T loan, and Mr. Lowery pledged his personal CD valued at $350,000. When Mr. Myers realized that the borrower on the loan was ICS rather than Fi-Data, he excused himself and called Mr. Lowery. Mr. Lowery told Mr. Myers that the loan was needed immediately and that loaning the money directly to Citizens or Fi-Data would take too much time. Mr. Lowery also assured Mr. Myers that his stock in Citizens, CBI, and Farmers was worth more than $9.4 million.

After this conversation, Mr. Myers signed the documents, pledging his $750,000 in CDs for the loan to ICS. Mr. Myers testified that he agreed to pledge the CDs as a favor to Mr. Lowery and did not expect to be compensated. There are no written documents connecting Mr. Myers' pledge of the CDs for the March 2, 2011, loan to ICS with Fi-Data or Citizens.

9 - U.S. Bankruptcy Court, M.D. Tenn.

That same date, TB&T issued its check made payable to ICS in the amount of $1,100,000. Mr. Lowery endorsed this check as president of ICS, for deposit to the TB&T account of Fi-Data. ICS, Citizens, and ESC did not maintain bank accounts at TB&T. Fi-Data's account manager, Andrea Martin (hereinafter "Ms. Martin"), recorded this transaction as a credit to Fi-Data's general ledger account, an asset account wherein all transactions in the TB&T checking account were recorded. Ms. Martin also recorded the transaction to Fi-Data's liability account wherein intercompany payables to ICS were recorded. With this transaction, the balance of Fi-Data's recorded payable to ICS was $1,100,000. At the same time, another general ledger receivable account reflected that Fi-Data was owed $112,800 by ICS.

The $1,100,000 was rapidly disbursed by Fi-Data. Approximately $417,000 was paid to FiServ. Additionally, on the day the funds were deposited, Fi-Data paid $226,750 to ESC and $75,000 to ICS. Fi-Data also used $100,000 to pay down its line of credit with Farmers Bank of Portland and transferred other sums to its operating account with TCB. From the TCB account, Fi-Data paid ICS another $212,000 on March 24, 2012. Also, Fi-Data continued to make transfers to Citizens. On March 14, 2011, Fi-Data transferred $134,000 to Citizens, followed by $35,000 on March 15, and $18,000 on March 16. On March 25, Mr. Lowery also caused Fi-Data to sign a note to TCB in the amount of $975,000, and Fi-Data immediately transferred the proceeds of this loan to Citizens. Between March 29 and April 1, 2011, Fi-Data transferred an additional $147,350 to Citizens.

10 - U.S. Bankruptcy Court, M.D. Tenn.

Mr. Lowery wanted his $350,000 CD pledged to TB&T to be replaced by a CD from Fi-Data. To accomplish this, in early June 2011, Fi-Data borrowed in excess of $141,800 via loans secured by automobiles owned by Fi-Data. These loan proceeds, together with an additional $88,200 provided by the proceeds of a personal loan to Mr. Lowery and $120,000 cash from ICS, were deposited into Fi-Data's account at TB&T. On June 14, 2011, these funds financed Fi-Data's purchase of a $350,000 CD with TB&T, which Fi-Data pledged as collateral for the $1,100,000 ICS loan. In conjunction with this pledge, TB&T released Mr. Lowery's CD on June 14, 2011, while Mr. Myers' CDs, valued at $750,000, remained pledged to TB&T.

The pattern of transfers of Fi-Data cash to Citizens continued through September 2011. Between March 2 and September 13, 2011, Fi-Data transferred a net value of $628,054 to Citizens. During this same period, Citizens transferred a net amount of $342,005 to ICS, with many of these transfers occurring either the same date as transfers from Fi-Data to Citizens or within a few days thereafter. The raiding of Fi-Data's cash for use by Citizens and other Lowery-controlled entities ended only after the Bank Group[3] took control of Fi-Data, and Fi-Data's president, Jean Ramsey (hereinafter "Ms. Ramsey"),

---

[3]Prior to the bankruptcy filings, TCB sold participations in loans to Citizens to Legends Bank and three other community banks operating in Middle Tennessee. TCB, Legends Bank, and the three other banks holding participations in these loans are referred to collectively as the "Bank Group."

refused to make additional cash transfers.  After the separation of Fi-Data from the other Lowery-controlled entities, Fi-Data quickly experienced a positive cash flow.

On September 13, 2011, Fi-Data permitted TB&T to apply its CD to the outstanding balance of the loan, leaving $750,000 of outstanding principal secured by Mr. Myers' pledged CDs.  On September 13, 2011, December 29, 2011, April 24, 2012, and August 13, 2012, Mr. Myers paid the interest and executed the documents necessary to renew the TB&T loan to ICS.  Fi-Data had no involvement with the ICS loan after application of its pledge in September 2011.  Mr. Myers paid the interest to keep the notes current so that his CDs would not be applied to the loan.  Eventually, Mr. Myers' CDs were applied, and the ICS loan is now paid-in-full.

Citizens filed its voluntary Chapter 11 petition on November 28, 2011. By Memorandum Opinion and Order, entered on February 27, 2012, this Court ordered the appointment of a Chapter 11 Trustee, and Mr. Gary Murphey was later approved to serve in that role.  On May 18, 2012, Mr. Myers sued Fi-Data in the Chancery Court for Williamson County, Tennessee, seeking exoneration with respect to the loan and reimbursement of the interest he had paid thereon.  These proceedings were stayed when the Chapter 11 Trustee filed a voluntary Chapter 11 on behalf of Fi-Data on July 31, 2012.  By subsequent order, the Chapter 11 Trustee assumed the duties of Fi-Data as debtor-in-possession in its Chapter

11 case.  The Chapter 11 cases of Citizens and Fi-Data have been consolidated for purposes of administration.

On September 14, 2012, this Court approved the sale of substantially all of Fi-Data's assets to FiServ, and on February 1, 2013, Fi-Data filed a disclosure statement and plan of liquidation.  The disclosure statement was approved on March 19, 2013, and the plan was confirmed on May 17, 2013.

Mr. Myers filed timely proofs of claim against Citizens and Fi-Data, claiming a right to repayment of the pledged CDs in the amount of $750,000, plus all interest paid on the loan to ICS.  On October 23, 2012, the Chapter 11 Trustee objected to these claims.  Thereafter, Mr. Myers filed a timely response to Citizens's objections, and the matter was heard on May 10, 2013.

## II. **DISCUSSION**

Mr. Myers admits that he has no written contract with Fi-Data or Citizens. Instead, he asserts that he is entitled to his claims based on unjust enrichment.[4] The theory of unjust enrichment is a quasi-contractual theory under which a court may impose and enforce a contract implied in law. *See Freeman Indus., LLC v. Eastman Chem. Co.,* 172 S.W.3d 512, 524-525 (Tenn. 2005). To make out a claim for unjust enrichment, a plaintiff must show: "1) '[a] benefit conferred upon the defendant by the plaintiff'; 2) 'appreciation by the defendant of such benefit'; and 3) 'acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.'" *Id.* at 525 (citation omitted).

The most important requirement under a theory of quasi-contract is that the enrichment to the beneficiary must be unjust. *Bennett v. Visa U.S.A. Inc.,* 198 S.W.3d 747, 756 (Tenn. Ct. App. 2006) (citation omitted). If the beneficiary "'has given any consideration to any person' for the benefits received from the plaintiff, there is no injustice in allowing the defendant to retain those benefits without paying the plaintiff." *Id.* (citation omitted).

---

[4]The Statute of Frauds does not preclude the recovery of damages for unjust enrichment. *EnGenius Entm't, Inc. v. Herenton,* 971 S.W.2d 12, 20 (Tenn. Ct. App. 1997) (citations omitted).

14 - U.S. Bankruptcy Court, M.D. Tenn.

In addition, if a contract exists covering the subject matter of the suit, but the plaintiff and defendant beneficiary are not in privity under that contract, the plaintiff must demonstrate that he has exhausted his remedies against the party with whom the plaintiff enjoyed privity of contract before proceeding against the defendant. *Freeman Indus.,* 172 S.W.3d at 525 (citations omitted).[5]

## A. <u>Lack of Contract</u>

In the present case, there is no contract between Mr. Myers and Citizens and/or Fi-Data. TB&T loaned money to ICS, and Mr. Myers pledged his CDs in the amount of $750,000 as collateral for the loan. However, Mr. Myers argues that ICS's status as borrower under the TB&T loan "is of no moment, since the loan proceeds went to Fi-Data and Fi-Data was intended to be the beneficiary of the loan," and that therefore, Fi-Data "is in the posture of a primary or principal obligor."

Mr. Myers' theory ignores the traditional formalities of both contract and corporate law. ICS is the entity obligated under the TB&T loan. ICS is today, and was at the time of

---

[5]The Chapter 11 Trustee asserts that Mr. Myers cannot seek an equitable remedy because he failed to pursue an action against ICS and/or Mr. Lowery. The testimony clearly showed that there was no possibility of recovery from either. Even the Chapter 11 Trustee testified that he had little hope of recovering any funds from ICS or Mr. Lowery for the benefit of the estates. The law does not require parties to pursue impossibilities. *Id.* at 526 ("to maintain an action for unjust enrichment a plaintiff is not required to exhaust all remedies against the party with whom the plaintiff is in privity if the pursuit of the remedies would be futile").

the TB&T loan, a validly-formed and existing corporation. The Assignment of Deposit Account executed by Mr. Myers to pledge his CDs expressly identified ICS as the borrower. Neither Citizens nor Fi-Data is a party to the document and they are not mentioned in it. Moreover, at the time of his pledge, Mr. Myers actually knew that ICS was a separate corporation from Citizens and its wholly-owned subsidiary, Fi-Data. If Mr. Myers wanted a direct claim against Fi-Data or Citizens, he could have taken steps to obtain a contractual commitment from Fi-Data, Citizens, and/or Mr. Lowery. Mr. Myers did not take any such steps, and the Court finds that there is simply no basis to ignore the express terms of the loan documents signed by him, TB&T, and Mr. Lowery.

Under Tennessee law, corporations are treated as entities distinct from their shareholders, officers, and directors, and corporate formalities are disregarded only upon a showing of special circumstances – such as inequity arising from the use of a corporate entity to defraud or perform illegal acts. *Pamperin v. Streamline Mfg., Inc.,* 276 S.W.3d 428, 436-37 (Tenn. Ct. App. 2008). Veil piercing, whether upstream or downstream, between a parent corporation and its subsidiaries, is not a favored remedy and must be specifically established by a plaintiff in order to receive the requested relief. *Id.* at 437. Mr. Myers admits that he does not assert a corporate veil piercing theory, and he does not allege that ICS, Citizens, and Fi-Data should be treated as one entity. Instead, Mr. Myers asks equity to hold Fi-Data liable on the sole theory that it received, and benefitted from, the TB&T loan proceeds.

16 - U.S. Bankruptcy Court, M.D. Tenn.

In light of the parent-subsidiary relationships among ICS, Citizens, and Fi-Data, any benefit received by Fi-Data from the TB&T loan transaction is an insufficient basis to either hold Fi-Data liable for ICS's failure to repay its TB&T loan or on which to base recovery against Fi-Data under an unjust enrichment theory. ***See Regency Holdings (Cayman), Inc. v. The Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.),*** 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) ("[a]s a rule, parent and subsidiary corporations are separate entities, having separate assets and liabilities . . . . The parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's . . . . Hence, the parent's creditors have no claim to the subsidiary's assets, and vice versa. A party seeking to overcome the presumption of separateness must pierce the corporate veil, or prove that the two entities should be substantively consolidated") (internal citations omitted). To allow Mr. Myers' unjust enrichment claim under the circumstances of this case would effectively allow an end run around the alter ego doctrine.

## B.  Benefit Conferred on Fi-Data

Unjust enrichment requires that a benefit be conferred. At first blush, Fi-Data here appears to have received a benefit from the loan. However, to succeed under a quasi-contract theory, the beneficiary cannot have provided reasonable value to any person or entity for the value it received, regardless of whether the party claiming unjust enrichment received any value from the beneficiary. ***See Bennett v. Visa U.S.A. Inc.***, 198 S.W.3d 747, 756 ("[i]f a third-party defendant 'has given any consideration to any person' for the benefits

received from the plaintiff, there is no injustice in allowing the defendant to retain those benefits without paying the plaintiff"). As applied to Mr. Myers' claim, Fi-Data was not unjustly enriched, as it paid far more to Citizens and ICS than it received in benefit from the TB&T loan to ICS.[6]

In this case, Fi-Data more than paid for the benefit received from the TB&T loan proceeds. During the year prior to the TB&T loan, large portions of Fi-Data's revenues were paid to Citizens and other Lowery-controlled entities. The net amount transferred from Fi-Data to Citizens during the year prior to March 3, 2011, totaled $2,620,143.05, including a net of $333,570.30 from January 1, 2011, to March 3, 2011. From October through December of 2010, the period during which FiServ billed the $432,250.34 in invoices that subsequently became the subject of FiServ's demand letter, Fi-Data transferred a net amount of $1,225,181.29 to Citizens, including $363,000 between November 12 and November 15, 2010. But for these payments to Citizens, which greatly exceeded the amount of the TB&T loan proceeds, Fi-Data would have had more than enough cash to pay the obligations to FiServ and the other creditors who were paid in March after the TB&T loan proceeds were

---

[6]In *Bennett*, a consumer brought a class action against Visa and MasterCard, alleging that the credit card companies had unjustly benefitted by requiring merchants who accepted their credit cards to also accept their debit cards. *Id.* at 751. The Court dismissed the unjust enrichment claim as a matter of law because the credit card companies had agreed to pay the merchants $3.05 billion in settlement agreements resolving the merchants' class action suit. *Id.* at 756-57. Because the credit card companies had paid consideration to the merchants for the alleged wrong, the consumers could not recover under an unjust enrichment theory. *Id.* at 757.

18 - U.S. Bankruptcy Court, M.D. Tenn.

received.  Like the credit card companies who had paid the merchants to settle their class action, Fi-Data's prior payments to ICS and to Citizens were more than adequate consideration for the benefit received from the TB&T loan proceeds.

Not only did Fi-Data pay for the benefit of the loan proceeds through transfers made prior to its receipt of the TB&T loan proceeds, Fi-Data continued to make payments after these funds were received.  On the day the proceeds were deposited, Fi-Data returned $75,000 to ICS and $226,000 to ESC, a wholly-owned subsidiary of ICS. On March 24, 2012, Fi-Data transferred another $212,000 to Citizens.  In June 2011, Fi-Data pledged a $350,000 CD as collateral for the loan ICS obtained from TB&T.  Fi-Data borrowed to generate a significant portion of the funds needed to buy this CD.  This CD was applied against the TB&T loan upon its maturity in September 2011.  Additional net transfers of sums away from Fi-Data to Citizens and other Lowery-controlled entities continued unabated after the time of the TB&T loan until the late summer of 2011, when Ms. Ramsey refused to make any further transfers.

In summary, between March 3 and September 13, 2011, Fi-Data transferred a net of $1,603,054.77 to Citizens, $240,250.00 to ESC, and $595,455.71 to ICS, including Fi-Data's pledge of a $350,000.00 CD to TB&T – representing approximately $2.4 million in outgoing cash.  Fi-Data paid far more than what it received from its parent entities and was not unjustly enriched; therefore, Mr. Myers cannot recover against Fi-Data. *See Paschall's, Inc.*

19 - U.S. Bankruptcy Court, M.D. Tenn.

*v. Dozier,* 407 S.W.2d 150, 155 (Tenn. 1966) ("if the landowner has given any consideration to any person for the improvements, it would not be unjust for him to retain the benefit without paying the furnisher"); ***Venture Const. Co. v. Apple Music City, Inc.,*** 847 S.W.2d 509, 511 (Tenn. Ct. App. 1992) (where property owner advanced money to lessor for construction costs, and where lessor did not remit payment to contractor, owner was not liable to contractor under a theory of unjust enrichment). Fi-Data's realization of any benefit from the TB&T loan transaction is not unjust because Fi-Data directly accounted for, and paid for, what it received from the TB&T loan proceeds. ***See Black v. Boyd,*** 248 F.2d 156, 162 (6th Cir. 1957) (no unjust enrichment where bank applied monies received against a loan previously made). Both before and after the TB&T loan to ICS, Fi-Data's funds flowed upstream to ICS and Citizens, and to ESC, a wholly-owned subsidiary of ICS. Fi-Data was not unjustly enriched because it gave consideration well in excess of what it received from the TB&T loan to ICS. Fi-Data should not be required to pay for a benefit twice, which is precisely the result that Mr. Myers' $750,000 claim seeks.

## C. <u>Benefit Received by Mr. Myers</u>

The facts show that Mr. Myers had a personal interest in pledging his CDs for the loan. There is no dispute that Fi-Data was Citizens' primary asset as well as Citizens' only income-generating source or that the value of Mr. Myers' investments in Citizens was dependent upon maintaining the value and the cash flow of Fi-Data. The value of Fi-Data

was, in turn, inextricably tied to its ability to use the software licensed by ESC from FiServ.

Mr. Myers was well aware of these facts. When Mr. Lowery approached him with news of

Fi-Data's purported cash flow and license issues, Mr. Myers knew that the value of his

investment in the Lowery-controlled entities, especially Citizens, was at stake. Moreover,

at the time Mr. Myers pledged his CDs, he had executed notes payable to Citizens totaling

nearly $6 million. Mr. Myers expected Citizens to generate sufficient dividends to pay the

interest on those loans, and that could happen only if Fi-Data continued to generate

significant revenues that could be used by Citizens. Mr. Myers allowed his interest free debt

to Citizens to increase over time because he believed, whether reasonably or not, that the

value of his holdings exceeded the value of his debt.


In conjunction with their discussions regarding Mr. Myers' pledge of collateral for

the TB&T loan, Mr. Myers inquired about the value of his holdings in the Lowery-controlled

entities. Mr. Myers testified that Mr. Lowery informed him that the value of his holdings

was approximately $9 million, compared to $5.875 million in debt. It was only after

receiving this valuation information that Mr. Myers agreed to pledge his CDs to ensure that

Fi-Data's operations remained active, thereby protecting the value of his investment in

Citizens. A few days after Mr. Myers pledged his CDs, Mr. Lowery confirmed in writing

that the valuation of Mr. Meyers' ownership interest was approximately $9.4 million.

The facts establish that Mr. Myers had a substantial self-interest in Fi-Data's ability to continue operating in early 2011, and thus, Mr. Myers had a self-interested reason to pledge his CDs as collateral for the TB&T loan. Under these circumstances, where Mr. Myers was motivated to protect his interests as a shareholder in Citizens, there is absolutely nothing unjust about his providing a benefit to Fi-Data. "Where no compensation is discussed or agreed upon in advance for services requested by and rendered to another, the presumption that compensation was intended is rebutted by circumstances which negate such an intention. One of such circumstances is a strong self-interest in the outcome of the transaction on the part of the party furnishing the service." *Meyering v. Milliman (In re Camfield's Estate),* 88 N.W.2d 388, 393 (Mich. 1958). Mr. Myers' ability to accumulate wealth in the form of his investment in Citizens and to avoid out-of-pocket payments on his Citizens' notes was directly tied to Fi-Data's continued operations. In situations "where the services rendered benefitted both parties," a plaintiff is not entitled to "recovery under the quantum meruit doctrine because services performed for the mutual benefit of both parties are ordinarily done without the expectation of payment" when performed. *Quadrille Bus. Sys. v. Ky. Cattlemen's Assoc., Inc.*, 242 S.W.3d 359, 366 (Ky. Ct. App. 2007); *see also Peko Oil USA v. Evans*, 800 S.W.2d 572, 577 (Tex. Ct. App. 1990) (no recovery under unjust enrichment when services performed for business reasons and without contemplation of direct cash payment); *Maple Island Farm, Inc. v. Bitterling,* 209 F.2d 867, 871-72 (8th Cir. 1954) (citation omitted) (no recovery under unjust enrichment for preliminary services

22 - U.S. Bankruptcy Court, M.D. Tenn.

done in anticipation of obtaining a contract); **Dunn v. Phoenix Village, Inc.,** 213 F. Supp. 936, 954 (W.D. Ark. 1963) (plaintiff's desire to place himself in favorable business position made unjust enrichment claim to recover loan proceeds untenable).  Mr. Myers' involvement in the transaction was self-interested, and therefore, there is no basis for allowing his claim against Fi-Data.


### D.  Expectation of Compensation

Even if Mr. Myers did not act out of self-interest, his pledge of the CDs was at best gratuitous, and equity does not enforce a gratuitous claim.  Mr. Myers testified that he was induced to provide the pledge by his friendship with Mr. Lowery and had no expectation of compensation.  A central element to recovery under any theory of unjust enrichment is that the circumstances indicate that the parties involved should have reasonably understood that the person providing the goods or services expected to be compensated. **Doe v. HCA Health Servs. of Tenn., Inc.**, 46 S.W.3d 191, 198 (Tenn. 2001).  Thus, where a party "makes a gift or voluntarily pays money which he knows he does not owe confers a benefit; in neither case is he entitled to restitution."  RESTATEMENT (FIRST) OF RESTITUTION § 1, cmt. c. (1937).


In the present case, Mr. Myers acknowledges that he was an "accommodation guarantor," that he received "no compensation or consideration, nor was he promised any, nor did he ask for any."  Instead, Mr. Myers "was simply accommodating the request of a person in whom he placed great trust, Lowery."  A voluntary promise or service on behalf

23 - U.S. Bankruptcy Court, M.D. Tenn.

of a third party cannot subsequently form the basis of an unjust enrichment claim.  In other words, "that which was intended originally as a gratuity cannot subsequently be turned into a charge." ***Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc.,*** 243 F. Supp. 2d 386, 412 (M.D.N.C. 2003) (citation omitted).

Prior to pledging his $750,000 in CDs as security for the TB&T loan to ICS, Mr. Myers did not contact any party associated with Fi-Data concerning the loan, with the exception of Mr. Lowery, who held no official title with Fi-Data.  Mr. Myers, a longtime investment broker by trade, voluntarily entered into a transaction for a trusted friend, just as he had done on at least seven separate occasions during the previous eight years.  Because Mr. Myers' pledge was a voluntary transaction where he expected no compensation at the outset, he is not entitled to a claim for unjust enrichment.

### E.  Other Equitable Considerations

Finally, the Court finds that even if Mr. Myers had proven the elements of unjust enrichment, he would not be entitled to equitable relief.  It is generally accepted that equity helps those who help themselves.  ***See, e.g., Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.,*** 520 F.3d 1116, 1129 (10th Cir. 2008) (citation omitted) ("'equity will not help those who do not help themselves'"); ***Metro Motors v. Nissan Motor Corp. in U.S.A.,*** 339 F.3d 746, 750 (8th Cir. 2003) (citation omitted) (no abuse of discretion where court refused to help

party that "could have helped itself and did not"); ***Picker Fin. Group L.L.C. v. Horizon Bank,*** 293 B.R. 253, 263 (M.D. Fla. 2003) (declining to grant equitable relief where party made no attempt to review available title search, thus failing to discover an intervening lien); ***Bear Stearns Mortg. Capital Corp. v. Am. Home Mortg. Inv. Corp. (In re Am. Home Mortg. Holdings, Inc.),*** 409 B.R. 284, 288 (D. Del. 2009) (party who failed to take timely actions to protect interests was not entitled to equitable relief) (citations omitted); ***Quilling v. Trade Partners, Inc.,*** No. 1:03-cv-236, 2011 WL 3585242, at *7 (W.D. Mich. March 22, 2011) (citations omitted) (equity not served by granting relief where movant could have accomplished same result if he had "taken appropriate and timely action"); ***Dunn v. Phoenix Village, Inc.,*** 213 F. Supp. 936, 954-55 ("court cannot supply by interpretation or otherwise material stipulations or interpret the action of the parties so as to make a valid contract where they have not taken the precaution to do so") .


The facts of this case do not suggest that Mr. Myers was an unknowing, unsophisticated, or unwitting participant in the loan from TB&T to ICS. Mr. Myers, an investment broker for many years, was a frequent participant in transactions with Mr. Lowery and Lowery-controlled entities. When he pledged the $750,000 in CDs, he knew that the borrower was ICS rather than Citizens or Fi-Data. His only due diligence was to call Mr. Lowery, who assured him that the loan was to ICS because time was of the essence and that neither he nor Fi-Data could come up with sufficient collateral under the circumstances.

With this information, which should have raised a red flag, Mr. Myers did not ask Mr. Lowery, Citizens, or Fi-Data to provide any security for his pledge. In fact, he testified that he made the pledge as a personal favor to Mr. Lowery.

Mr. Myers has failed to show that he is entitled to an equitable remedy of unjust enrichment.

### III. <u>CONCLUSION</u>

Accordingly, the Court finds that the Chapter 11 Trustee's motion to disallow the claims of Mr. Myers should be granted and that Mr. Myers' claims should be disallowed.

An appropriate order will enter.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.